UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | * FILED: | 5/31/2016 |
| LISA HERNANDEZ | * | CIVIL ACTION NO. 3:14-CV-42-SDD-EWD |
| VERSUS | * | JUDGE SHELLY D. DICK |
| EARL THERIOT, ET AL. | * | MAGISTRATE ERIN WILDER-DOOMES |

**************************************************************************

**DEFENDANT EARL THERIOT'S
PROPOSED
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**MAY IT PLEASE THE COURT:**

Defendant, Earl Theriot ("Mr. Theriot"), hereby submits his proposed findings of fact and conclusions of law in connection with the bench trial set for Monday, June 6, 2016. Plaintiff is claiming under 42 U.S.C. § 1983 for damages including personal injuries that allegedly occurred on November 1, 2013, stemming from her claims that Mr. Theriot falsely imprisoned and sexually assaulted her while she was in his custody in his office in the Sorrento Town Hall. Mr. Theriot strongly denies Plaintiffs' allegations; moreover, it is plain that Plaintiff cannot meet her burden of proof as to either liability or damages. Accordingly, the Court should enter judgment against the Plaintiff.

**I.  PROPOSED FINDINGS OF FACT:**

    **A.  The Parties.**

1. Plaintiff Lisa Hernandez ("Ms. Hernandez" or "Plaintiff"), is a major and resident of the Parish of Ascension, State of Louisiana.

2. Defendant Earl Theriot, a major and resident of the Parish of Ascension, State of

Louisiana, is the former Chief of Police for the Town of Sorrento. Defendant Town of Sorrento ("Sorrento"), is a municipal corporation falling under the Lawrason Act (La. Rev. Stat. 33:321, *et seq*.). Defendant Risk Management, Inc., is a quasi-state corporation that provided general liability insurance to the Town of Sorrento including the Sorrento Police Department and Mr. Theriot.

### B. The events of November 1, 2013.

3. "According to Hernandez, she was out drinking all night on 10/31/2013 with friends. At the end of the night a friend of Hernandez's dropped her off at a gas station/convenience store. It was still dark outside when Hernandez was dropped off by her friend." (Interview of Lisa Hernandez by F.B.I. Special Agent Kobey McCall and Ascension Paris Sheriff's Office Captain Mike Toney on December 3, 2013 "Hernandez FBI Interview", p. 1).

4. On the afternoon of November 1, 2013, 911 received a call regarding an apparently intoxicated woman near 21 Junk Street, 9291 Airline Highway, Sorrento, Louisiana.

5. Mr. Theriot, who was then the elected Chief of Police for the Town of Sorrento, responded to the scene. He found Ms. Hernandez responsive though intoxicated. Ms. Hernandez told Mr. Theriot her home address. It is undisputed that at the time Mr. Theriot found Ms. Hernandez, she had in her possession a bottle of vodka (Hernandez FBI Interview, p. 5). Mr. Theriot took the bottle of vodka from Ms. Hernandez (Interview of Vickie Dupuy by F.B.I. Special Agent Kobey McCall and Ascension Paris Sheriff's Office Captain Mike Toney on January 22, 2014, p. 1).

6. Emergency medical services responded shortly after Mr. Theriot arrived. Ms. Hernandez refused treatment. Because Ms. Hernandez was responsive but nevertheless seemingly intoxicated, Mr. Theriot opted to take her back to her house where she lived with her mother and

boyfriend, Dwayne Hingle ("Mr. Hingle").

7. Ms. Hernandez sat in the front seat of Mr. Theriot's vehicle. She was not in handcuffs. Ms. Hernandez pleaded with Mr. Theriot not to take her to jail. Mr. Theriot drove Ms. Hernandez to her house. On the way to her house, "Hernandez stated she wore Theriot's police hat" (Hernandez FBI Interview, p. 3). When they arrived at her home, Ms. Hernandez refused to get out of Mr. Theriot's car. Ms. Hernandez stated to the FBI "she probably could have gotten out of Theriot's car at that point, but that wasn't planned and agreed to . . . [Ms. Hernandez] also saw her mother's vehicle parked in the driveway of the residence and Hernandez was scared as she did not want her mother to yell at her." (Hernandez FBI Interview, p. 2). Ms. Hernandez was intoxicated, and she failed to return home the previous night. In fact, Ms. Hernandez "did not want Theriot to pull up in front of her house at all." (Hernandez FBI Interview, p. 2).

8. Because Ms. Hernandez refused to exit his vehicle at her home, Mr. Theriot proceeded to drive her to his office.

9. Mr. Theriot told Ms. Hernandez there was a Global Positioning System ("GPS") locator in his police unit when he attempted to drop her off at her house.

10. In her verified Amended Complaint, Ms. Hernandez claimed that Mr. Theriot "proceeded with plaintiff in his unit to an unknown convenience store where he stopped to purchase vodka for plaintiff". (Amended Complaint, Paragraph 14, p. 5.) There is no GPS log that shows Mr. Theriot stopping at a convenience or other store while Ms. Hernandez was in his custody.

11. In her verified Amended Complaint, Ms. Hernandez also asserted that Mr. Theriot "places plaintiff in handcuff and removes plaintiff's belt and restrains her with it and forces plaintiff to wait in his office under his desk". (Amended Complaint, Paragraph 16, p. 5.) Ms. Hernandez further testified in her deposition that Mr. Theriot locked her in his office.

3

Deposition of Lisa Hernandez, pps. 32, lines 17; 33, 6-9. However, it was impossible to lock anyone in Mr. Theriot's office: the inside door knob had a button placed in the middle of the knob so that the person in the office could lock someone out, but no one could not be locked in. (Exhibit B-9). Furthermore, more accurately, Ms. Hernandez had previously stated to the FBI that she "thought Theriot locked the door so that no one could come in and find her there" (Hernandez FBI Interview, p. 3).

12. While she was inside Mr. Theriot's office, Ms. Hernandez had free access to Mr. Theriot's desk telephone. During the course of the afternoon, Ms. Hernandez used the telephone to call her boyfriend, Mr. Hingle, several times. During her conversations with Mr. Hingle, Ms. Hernandez has testified that at that time she was not being physically restrained. Furthermore, although it is undisputed that Ms. Hernandez was left alone in Mr. Theriot's office with free access to a telephone, it is also undisputed that she failed to call 911, the Ascension Parish Sheriff's Office, or the FBI.

13. At one point during the afternoon of November 1, 2013, Officer Lynndell Augillard ("Officer Augillard") of the Sorrento Police Department was summoned by the 911 dispatcher to check on Ms. Hernandez in response to her call to Mr. Hingle. When Officer Augillard interacted with her, she did not tell him she needed help or was there against her will. Officer Augillard did not observe that Ms. Hernandez was restrained.

14. At 3:02 p.m. on November 1, 2013, Deputy Russell of the Ascension Parish Sheriff's Office ("APSO") Central Dispatch spoke to another APSO Deputy regarding his conversations with Mr. Hingle and said that he had "talked to the boyfriend a couple of times. I ah he just wanted to let you know that you know don't let her sweet talk you into dropping her off other; somewhere…than Camilla [sic]."

4

15. On November 1, 2013, there were numerous other persons in the police station including a representative of Risk Management, Officer Augillard, and Mayor Lambert. Ms. Hernandez was never heard to call out for help.

16. Ms. Hernandez was free to enter and leave Mr. Theriot's office. At at least one point on the afternoon of November 1, 2013, and before the sexual encounter, Ms. Hernandez was seen sitting on a bucket outside the Police Station smoking a cigarette. She acknowledged that she could move in and out of the building (Hernandez FBI Interview, p. 5).

17. Ms. Hernandez asserted in her deposition that after she called Mr. Hingle, Mr. Theriot was angry and restrained her with her belt to prevent her from using the telephone again while Mr. Theriot was absent from his office. (Deposition of Lisa Hernandez, p. 34, lines 4-9.) However, in her FBI interview, Ms. Hernandez admits she took her belt off in order to facilitate her sexual encounter with Mr. Theriot. Ms. Hernandez's interview indicates that Mr. Theriot did not leave her alone after they had their encounter and, thus, there would have been no occasion for Mr. Theriot to restrain her with her belt. (Hernandez FBI Interview pp. 5-6). Furthermore, in her FBI interview, Ms. Hernandez never mentions being physically restrained in Mr. Theriot's office except to assert that the door was locked to keep others from getting in. (Hernandez FBI Interview, generally, pps. 1-6.)

18. At least four sets of handcuffs were available to Mr. Theriot to restrain Ms. Hernandez. Leg restraints were also available to Mr. Theriot to physically restrain Ms. Hernandez had he wished to do so. At no time did Mr. Theriot physically restrain Ms. Hernandez. (Testimony of Michael Lambert, Mayor of the Town of Sorrento).

19. While inside Mr. Theriot's office, Ms. Hernandez had the presence of mind to secret in her purse a large set of keys and other objects.

20. Ms. Hernandez by her own admission "got up out of her chair [in Mr. Theriot's office] and walked over to Theriot and began touching and rubbing his pants." Hernandez then "performed oral sex on Theriot, but Theriot could not get a full erection and could not climax." (Hernandez FBI Interview, p. 4).

21. "Theriot zipped up his pants and then SPD Officer Aguillar ("Aguillar") [sic] knocked on Theriot's door." At that time, Ms. Hernandez did not tell Officer Augillard that she was being held against her will or forced to perform sex acts on Mr. Theriot. (Hernandez FBI Interview, p. 4).

22. Ms. Hernandez "took her pants down to her ankles and her belt was hanging and making noise so she took it off and put it on Theriot's desk."

23. Ms. Hernandez again "performed oral sex on Theriot again to 'get things working or going,' but Theriot still could not achieve an erection." There is no mention of attempted vaginal intercourse in the FBI Interview although Ms. Hernandez asserts in her deposition that they attempted sexual intercourse. (Hernandez FBI Interview, p. 5).

24. It is undisputed that Ms. Hernandez took off her own belt. (Hernandez FBI Interview, p. 5).

25. Mr. Theriot had been impotent and was impotent on the date of this incident.

26. Near the end of the day on November 1, 2013, Mr. Hingle arrived to pick up Ms. Hernandez. Mr. Hingle testified that Ms. Hernandez's belt was on the desk.

27. Although Mr. Hingle testified that Ms. Hernandez was in a disheveled and partially naked condition, he nevertheless subsequently advised Ms. Hernandez to call Mr. Theriot to return the keys and other objects that she had taken from his office. (Hingle Deposition, p. 3).

28. Upon Mr. Hingle's arrival at the police station, "[Officer] Augillard or [Mr.] Theriot gave the bottle to Dwayne [Hingle]. Dwayne poured the vodka out." (Hernandez FBI Interview, p. 5).

29. On November 4 and 12, 2013, Ms. Hernandez telephoned then-Chief Theriot on his cellular telephone leaving what can only be described as "flirty" messages for him to return her call. At the time these messages were left, Ms. Hernandez was not in contact with any other law enforcement agency, including the Federal Bureau of Investigation.

30. Ms. Hernandez's claims are both contradicted by Mr. Theriot's debriefing to the F.B.I. and belied by the facts. There is no evidence that Mr. Theriot restrained her or sexually assaulted Ms. Hernandez. There are no medical records or direct witness testimony from other persons in the building. Rather, the facts indicate that the sexual activity between Ms. Hernandez and Mr. Theriot was wholly consensual and not extorted by Mr. Theriot.

### C. Procedural History.

31. On January 17, 2014, Ms. Hernandez initiated the present suit by filing her complaint in the United States District Court for the Middle District of Louisiana against Mr. Theriot, individually, and in his capacity as police chief for the Town of Sorrento.

32. Ms. Hernandez amended her complaint on February 26, 2014 for the purpose of adding the Town of Sorrento, Mike Lambert, and Risk Management, Inc., as defendants.

33. On August 5, 2014, the Court found that Chief Theriot was the Town of Sorrento's policymaker and denied the Town of Sorrento's Motion to Dismiss the Town of Sorrento.

34. On May 23, 2016, the Court granted Mr. Theriot's Motion *in Limine* to exclude Ms. Hernandez's medical records; consequently, no evidence of Ms. Hernandez's damages outside of lay testimony may be offered at trial.

## II. PROPOSED CONCLUSIONS OF LAW:

35. "Battery is a harmful or offensive contact with a person, resulting from an act intended to cause him to suffer such a contact" while "[a]n assault is a threat of such harmful or offensive contact." *Brown v. Diversified Hospitality Group*, 600 So. 2d 902, 906 (La. App. 4 Cir. 1992); *See also*: *Landry v. Bellanger*, 2002 1443 (La. 05/20/03); 851 So. 2d 943, 949 (*quoting Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987)).

36. "Wrongful arrest, or the tort of false imprisonment, occurs when one arrests and restrains another against his will and without statutory authority. The tort of false imprisonment consists of the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 07/10/06); 935 So. 2d 669, 690.

37. Under Louisiana law, an action for intentional infliction of emotional distress consists of three elements:

    (1)    the conduct of the defendant was extreme and outrageous;

    (2)    the emotional distress suffered by the plaintiff was severe; and

    (3)    the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his (its) conduct.

*Lawson v. Straus*, 98-2096, p. 8 (La. App. 4 Cir. 12/8/99): 750 So. 2d 234, 240.

38. The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

39. Ms. Hernandez alleged that Mr. Theriot and the Town of Sorrento, jointly and/or severally, deprived her of her Fourth Amendment rights, and those rights, privileges, and immunities secured by the Fifth and Eighth Amendments to the Constitution as incorporated and applied to the states through the Fourteenth Amendment, by unlawfully imprisoning her and committing sexual assault against her. Because the activity engaged in between Mr. Theriot and Ms. Hernandez was consensual, Ms. Hernandez was not deprived of the foregoing constitutional rights and also as a result Ms. Hernandez cannot prove any state law tort claim.

40. Ms. Hernandez has failed to prove by a preponderance of the evidence that Mr. Theriot committed an assault or battery against her, and has further failed to show that Mr. Theriot intentionally caused her to suffer extreme emotional distress. Taken as a whole, the evidence neither shows that Ms. Hernandez was restrained by Mr. Theriot at any time, nor does it establish that Mr. Theriot either forced himself on Ms. Hernandez or otherwise assaulted and/or battered her. Ms. Hernandez's claims are contradicted by the weight of the evidence.

41. Furthermore, even if Ms. Hernandez could prove the elements of assault, battery, or intentional infliction of emotional distress by a preponderance of the evidence, she has failed to provide sufficient evidence as to her damages. She has provided no medical testimony or medical records to substantiate her claims that she suffered compensable emotional distress.

42. Likewise, Ms. Hernandez's claim under 42 U.S.C. § 1983 likewise must fail because she has failed to show by a preponderance of the evidence that Mr. Theriot committed any act that deprived her of any established constitutional rights.

Based on the foregoing proposed findings of fact and conclusions of law, Earl Theriot respectfully requests that judgment be granted in his favor and against the plaintiff, Lisa Hernandez.

          **Respectfully submitted this 31st day of May, 2016.**
**By:**    **The Law Office of Sally Dunlap Fleming, P.L.C.**

*/s Sally D. Fleming*
**SALLY D. FLEMING, T. A. Bar Roll No. 20814**
**OWEN M. COURREGES, Bar Roll No. 31113**
**818 Howard Avenue, Suite 305**
**New Orleans, LA 70113**
**Telephone: (504) 891- 3090**
**Telecopier: (504) 895-5190**

**Attorneys for Earl Theriot, individually.**

# CERTIFICATE OF SERVICE

      I hereby certify that on the 31st day of May, 2016, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of the filing to the following:

Mr. Charles Connell Wilson
Wilson & Wilson
8550 United Plaza Boulevard, Suite 702
Baton Rouge, LA 70803

Mr. Tregg C. Wilson
Wilson & Wilson
8550 United Plaza Boulevard, Suite 702
Baton Rouge, LA 70803

Mr. Scott Thomas
700 N. 10th St
Baton Rouge, LA 70802

      *s/ Sally D. Fleming*
      **SALLY DUNLAP FLEMING**